## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

HECTOR A. DEMONTALVO,

      Petitioner,

v.                                   Case No. 3:20-cv-5948-MCR/MJF

RICKY D. DIXON,[1]

      Respondent.

_____/

## **ORDER and**
## **REPORT AND RECOMMENDATION**

Petitioner Hector A. DeMontalvo has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. Doc. 1. Respondent ("the State") answered, providing relevant portions of the state court record. Doc. 6. DeMontalvo replied. Docs. 10, 11. The undersigned concludes that no evidentiary hearing is required for the disposition of this matter, and that DeMontalvo is not entitled to habeas relief.[2]

---

[1] Ricky D. Dixon succeeded Mark Inch as Secretary of the Florida Department of Corrections, and is automatically substituted as the Respondent. Fed. R. Civ. P. 25(d).

[2] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY[3]

On September 4, 2014, DeMontalvo, then 20 years old, went to a friend's house and consumed cocaine and other controlled substances. Another friend, Zachary Brown, also was at the home. Without warning, DeMontalvo pulled out a knife and stabbed Brown repeatedly. DeMontalvo then attempted to shoot Brown with a handgun. As Brown lay on the floor in a pool of blood, DeMontalvo repeatedly kicked Brown's head and struck it with a skateboard. When DeMontalvo had enough, he fled out the back door of the residence and broke into a neighboring home.

Anthony Baggett resided in the neighboring home. Baggett was asleep in a bedroom with his girlfriend, Kayla Young. DeMontalvo broke the bedroom window, climbed into the room, pointed a handgun to Baggett's head and pulled the trigger. The gun did not discharge. DeMontalvo then attempted to flee the scene by breaking

---

[3] The background facts are drawn from the sworn arrest report that provided the factual basis for DeMontalvo's *nolo contendere* plea. *See* Doc. 6-1, Ex. A at 66-69 (Plea Agreement); Ex. A at 57-65 (Plea Hr'g Tr.); Ex. A at 6-9 (Arrest Report); Doc. 6-2, Ex. B at 317-26 (J. & Sentence). Because DeMontalvo pleaded *nolo contendere* to only three of the six crimes with which he was charged, the facts detail only the three crimes of conviction.

into a car parked outside. DeMontalvo was still sitting in the car trying to start it when the police arrived. Doc. 6-1, Ex. A at 6-15 (Arrest Report).[4]

On September 23, 2014, DeMontalvo was charged in Escambia County Circuit Court Case No. 2014-CF-3813, with six crimes: (1) Attempted First-Degree Premeditated Murder of Zachary Brown With a Firearm (Count 1); (2) Attempted First-Degree Premeditated Murder of Anthony Baggett With a Firearm (Count 2); (3) Attempted First-Degree Premeditated Murder of Kayla Young With a Weapon (Count 3); (4) Burglary of a Dwelling While Armed With a Firearm (Anthony Baggett's dwelling) (Count 4); (5) Burglary of an Unoccupied Conveyance (Eugene Geri's vehicle) (Count 5); and (6) Burglary of an Unoccupied Conveyance (Anthony Baggett's vehicle (Count 6). Doc. 6-1, Ex. A at 4-5. Counts 1, 2 and 3 carried a maximum possible penalty of imprisonment for life. *Id*.; *see also* Doc. 6-1 at 60. The charges, together, carried mandatory minimum sentences that, if imposed consecutively, totaled 70 years in prison. *Id*.; *see also* Doc. 6-1, Ex. A at 60.

DeMontalvo was appointed counsel and negotiated a plea agreement. Doc. 6-1, Ex. A at 66-69 (Plea Agreement); Ex. A at 57-65 (Plea Hr'g Tr.). Pursuant to the

---

[4] Citations to the state-court record are to the electronically-filed exhibits attached to the State's answer. Doc. 6. The court cites the attachment number followed by the lettered exhibit and the page number according to the Bates stamp number on the bottom center of the page.

agreement, DeMontalvo pleaded *nolo contendere* to the following three crimes: (1) Attempted First-Degree Premeditated Murder With a Firearm (as charged in Count 1); (2) Aggravated Assault With a Firearm (a lesser-included offense of the attempted murder charged in Count 2); and (3) Burglary of a Dwelling While Armed With a Firearm (as charged in Count 4). In exchange for DeMontalvo's plea, the State agreed to *nolle prosse* Counts 3, 5 and 6.

The plea agreement did not include a sentence recommendation. DeMontalvo's sentence was left to the court's discretion. The parties agreed that DeMontalvo could seek any appropriate sentence, including non-state prison sanctions as a Youthful Offender, but that if prison sanctions were imposed, DeMontalvo was subject to mandatory minimum sentences totaling 33 years of imprisonment.[5] Doc. 6-1, Ex. A at 57-65, 66-69. The parties further agreed that the State could seek the maximum possible sentence for each crime to be served consecutively. Doc. 6-1, Ex. A at 57-65. The plea agreement was memorialized in a document titled "Sentence Recommendation," which was executed by DeMontalvo, defense counsel, and the prosecutor. Doc. 6-1, Ex. A at 66-69.

---

[5] Demontalvo was subject to a mandatory minimum term of 20 years of imprisonment on Count 1, a mandatory minimum term of 3 years of imprisonment on Count 2, and a mandatory minimum term of 10 years of imprisonment on Count 4. Doc. 6-1, Ex. A at 57-65, 66-69.

The trial court conducted a plea hearing on March 30, 2015, which was the day DeMontalvo executed his plea agreement. Doc. 6-1, Ex. A at 57-65. The trial court conducted a plea colloquy, observed that DeMontalvo appeared to be competent, determined that there was a factual basis for the plea, accepted DeMontalvo's plea, and set the matter for sentencing.

The court conducted sentencing hearing 86 days later, on June 24, 2015. Doc. 6-1, Ex. A at 70-173. During the hearing, the State played excerpts of DeMontalvo's video jail visitation with his sister, which occurred shortly after DeMontalvo committed the charged offenses. *Id.* at 81-92. In the video, DeMontalvo discussed his hatred for Mr. Brown and how he wanted him dead. *Id.* at 81-85, 89. DeMontalvo also bragged that he had a "photographic memory" and remembered everything he had done, but that he would "win" by "plead[ing] insanity," even if that meant "do[ing] something drastic to prove I'm insane." *Id.* at 86-88. When DeMontalvo's sister insisted, "I know you're sane," DeMontalvo responded:

> THE DEFENDANT: (inaudible). All right, I'm going to tell you, then, I – I brutally stabbed him through his throat, shot him in the head and stomped his head and, like, smashed his head with my skateboard. I jumped the back fence and, honestly, the first thing I think about is, (unintelligible), my big brother and I'm like, I'm going to rob this person for a car.
>
> I don't need anything. I had $1,175 cash in my pocket when I robbed them for their car. I just wanted a car. Becca wouldn't let me use her [sic] and Ben has a GPS in his, so, I'm, like, I'm going to get a

fucking car. Fuck it. I did some (inaudible) shit. I punched out a window and, like, people screamed and they came outside looking for me and I hid in the bushes and they went back inside. I went to the front door and I was, like, no, they're going to expect that. I went to the back, I was, like, they're going to expect that. So I went back to the window. I broke – originally, I'm not going to lie, I cocked my gun at them, I went, (sound indicated), and he screamed and he ran and I jumped through the window.

. . . .

[DEMONTALVO'S SISTER]: -- did you shoot them, though, or not?

THE DEFENDANT:  I – yeah, I'm pretty sure I shot him.

      So the first time I – I jumped through the window, I slashed my nose, right, and then the second time, I actually jumped through the window and I broke a huge piece of glass off in me –

. . . .

Yeah. So I – I, um – then I – I got the car keys, went out, I tried to kidnap that lady, it didn't work. If she was petite, I would have got her, but she was a fat lady. Anyway, um, I went to the first car, it was a Trailblazer, it wouldn't start and then it had no fucking door handles, so I found another window and jumped out that window. And then I went to a Volkswagen Bug. Got in the Bug and I was trying to turn the car and the police came.

*Id*. at 89-91.

      Following witness testimony at the sentencing hearing (including DeMontalvo's testimony), and after considering counsel's arguments, the trial court adjudicated DeMontalvo guilty of the three crimes consistent with the plea agreement. The trial court sentenced DeMontalvo to a total term of life

Page 6 of 38

imprisonment and ordered that the three mandatory minimum terms be served consecutively (totaling 33 years). *Id*. at 170-71; *see also* Doc. 6-2, Ex. B at 317-26 (J. & Sentence). The remaining three charges (Counts 3, 5 and 6) were *nolle prossed*. *Id*. The Florida First District Court of Appeal ("First DCA") affirmed the judgment and sentence *per curiam* and without written opinion. *Demontalvo v. State*, 194 So. 3d 1022 (Fla. 1st DCA 2016) (Table) (copy at Doc. 6-2, Ex. G).

After two unsuccessful motions that challenged his sentence, DeMontalvo filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which he later amended. Doc. 6-4, Ex. M at 8-18 (Initial Mot.); *Id*. at 19-48 (Am. Mot.). The state circuit court summarily denied relief. Doc. 6-4, Ex. M at 85-103 – Doc. 6-5, Ex. M at 104-77 (Order & Attach.). The First DCA affirmed *per curiam* and without written opinion. *DeMontalvo v. State*, 281 So. 3d 461 (Fla. 1st DCA 2019) (Table) (copy at Doc. 6-5, Ex. N).

After another unsuccessful motion to modify his sentence, Doc. 6-5, Exs. O-P, DeMontalvo filed his *pro se* federal habeas petition on November 17, 2020. Doc. 1.

DeMontalvo's petition raises four claims of ineffective assistance of trial counsel. DeMontalvo admits that he did not raise any of his claims in the state courts, and that they are procedurally defaulted. Doc. 1. DeMontalvo argues that the lack of

Page 7 of 38

counsel in his Rule 3.850 proceeding serves as cause to excuse his procedural default. Doc. 1 at 17a-17b (citing *Martinez v. Ryan*, 566 U.S. 1 (2012)).[6]

The State asserts that all of DeMontalvo's claims are unexhausted and procedurally defaulted, and that the defaulted claims fail to meet *Martinez*'s "substantial claim" requirement. Doc. 6.

In his reply, DeMontalvo abandons Ground 1, but claims that he is entitled to habeas relief on the remaining claims. Docs. 10, 11.

## II. RELEVANT LEGAL PRINCIPLES

### A.    Federal Habeas Exhaustion Requirement

Before seeking federal habeas relief under § 2254, the petitioner must exhaust all available state court remedies for challenging his conviction, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). "To satisfy the exhaustion requirement, the petitioner must have fairly presented the substance of his federal claim" to the state's highest court, either on direct appeal or on collateral review. *Picard*, 404 U.S. at 277-78; *Castille v. Peoples*, 489 U.S. 346, 351 (1989);

---

[6] Citations to page numbers of Demontalvo's petition are to the numbers appearing on the original document.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").

When a petitioner fails to exhaust his claim and the state court remedy no longer is available, that failure to exhaust is a procedural default. *O'Sullivan*, 526 U.S. at 839-40; *see also Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999) (holding that when a petitioner fails to properly exhaust a federal claim in state court, and it is obvious that the unexhausted claim now would be procedurally barred under state law, the claim is procedurally defaulted). "The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

A petitioner seeking to overcome a procedural default must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). To establish cause, a petitioner must "demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." *Ward v.*

*Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

Prior to *Martinez*, habeas petitioners were barred from establishing cause by claiming that they did not have counsel in their state postconviction proceeding (or that their collateral counsel was ineffective). *See Coleman*, 501 U.S. at 752-53. In *Martinez*, however, the Supreme Court created a limited, equitable exception to *Coleman* where: (1) "a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," as opposed to on direct appeal; (2) "appointed counsel in the initial-review collateral proceeding . . . was ineffective under the standards of *Strickland*" (or the prisoner did not have collateral counsel at all); and (3) "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one." *Martinez*, 566 U.S. at 14 (citations omitted).

To satisfy *Martinez*'s third prong, the petitioner "must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003), which described the standard for issuance of a certificate of appealability). The Eleventh Circuit construes the Supreme Court's citation to *Miller-El* "to mean that it intended that lower courts apply the already-developed standard for issuing a COA, which requires 'a substantial showing of the denial of a constitutional right.' 28 U.S.C. § 2253(c)(2)." *Hittson v. GDCP Warden*, 759 F.3d

Page 10 of 38

1210, 1269 (11th Cir. 2014). A petitioner satisfies the COA standard "by demonstrating . . . that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. The Eleventh Circuit elaborated on the "substantial claim" standard as follows:

> We observe that this standard is similar to the preliminary review conducted by district judges in § 2254 proceedings. Rule 4 of the § 2254 Rules allows the district judge to summarily dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief." The Advisory Committee Notes further instruct that, in keeping with the heightened, fact-pleading requirement in habeas cases, "the petition is expected to state facts that point to a real possibility of constitutional error." Advisory Committee Note to Rule 4 of the Rules Governing Section 2254 Cases (quotation marks omitted).
>
> Thus, we examine the allegations in . . . [the] § 2254 petition to see whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." In making this determination, we consider the fact-pleading requirement for § 2254 petitions, and the standard from *Strickland*.

*Hittson*, 759 F.3d at 1270.

## B.   **Federal Law Governing *Nolo Contendere* Pleas**

In determining the validity of a plea to a criminal charge, a plea of *nolo contendere* stands on equal footing with a guilty plea. *North Carolina v. Alford*, 400 U.S. 25, 35-36 (1970); *Hudson v. United States*, 272 U.S. 451 (1926); *see also Florida v. Royer*, 460 U.S. 491, 495 n. 5 (1983) ("Under Florida law, a plea of nolo contendere is equivalent to a plea of guilty."). "A reviewing federal court may set

aside a state court guilty plea only for failure to satisfy due process." *Stano v. Dugger*, 921 F.2d 1125, 1141 (11th Cir. 1991) (*en banc*) (citing *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969)). The Due Process Clause requires that a guilty plea be entered knowingly and voluntarily. *Boykin*, 395 U.S. at 243 n.5; *see also Bousley v. United States*, 523 U.S. 614, 618 (1998). "A guilty plea is an admission of criminal conduct as well as the waiver of the right to trial." *Finch v. Vaughn*, 67 F.3d 909, 914 (11th Cir.1995) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)).

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748. Accordingly, in the context of a guilty plea, the standard for determining the validity of the plea is "whether the plea represents a voluntary intelligent choice among the alternative courses open to the defendant." *Alford*, 400 U.S. at 31; *Boykin*, 395 U.S. at 242. The assistance of counsel received by a defendant is relevant to the question of whether a defendant's guilty plea was knowing and intelligent insofar as it affects the defendant's knowledge and understanding. *See McMann v. Richardson*, 397 U.S. 759, 770-74 (1970).

The advantages of entering a plea only may be secured "if dispositions by guilty plea are accorded a great measure of finality." *Blackledge v. Allison*, 431 U.S.

63, 71 (1977). Recognizing that a prisoner often "has everything to gain and nothing to lose from filing a collateral attack upon his guilty plea," courts accord great deference to a defendant's statements during a plea colloquy and are reluctant to allow a defendant to go behind his own sworn testimony. *Blackledge*, 431 U.S. at 71.

> [T]he representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Id.* at 73-74 (citations omitted). "The plea process brings to the criminal justice system a stability and a certainty that must not be undermined by the prospect of collateral challenges in cases not only where witnesses and evidence have disappeared, but also in cases where witnesses and evidence were not presented in the first place." *Premo v. Moore*, 562 U.S. 115, 132 (2011).

When a petitioner challenges the voluntariness of his plea based on allegations of ineffective assistance of counsel, the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), applies. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *see also Premo*, 562 U.S. at 118 (identifying *Strickland* as the clearly established federal law governing a habeas petitioner's challenge to his conviction obtained

through a plea bargain). To obtain relief under *Strickland*, a petitioner must establish that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The focus of *Strickland*'s performance prong in a plea situation is "whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill*, 474 U.S. at 56–57 (quoting *McMann*, 397 U.S. at 771). "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial." *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984). "To impart such an understanding to the accused, counsel must, after making an independent examination of the facts, circumstances, pleadings and laws involved, offer his informed opinion as to the best course to be followed in protecting the interests of his client. *Wofford*, 748 F.2d at 1508 (citing *Walker v. Caldwell*, 476 F.2d 213, 217 (5th Cir. 1973), in turn citing *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948)).

"Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused regarding the plea. *Stano*, 921 F.2d at 1150–51 (citing *McMann*, 397 U.S. at 774; *Tollett v. Henderson*, 411 U.S. 258, 267 (1973); and *Hill*, 474 U.S. at 56).

To meet *Strickland*'s prejudice prong in a plea situation, the petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59. "It is not enough for [the petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must demonstrate a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill*, 474 U.S. at 58-59. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

The Supreme Court has said that a petitioner "must convince the court that a decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010). That is a difficult showing when the record shows that the petitioner had no viable defenses and that there was overwhelming evidence of his guilt. *See Diveroli v. United States*, 803 F.3d 1258, 1265 (11th Cir. 2015) (explaining that it would not have been rational for the defendant to have rejected his plea agreement because of the evidence of his guilt and the lack of any valid defenses); *Lynch v. Sec'y, Fla. Dep't of Corr.*, 776 F.3d 1209, 1218-19 (11th Cir. 2015) (same); *see also Sierra v. Sec'y, Fla. Dep't of Corr.*, 657 F. App'x 849, 852 (11th Cir. 2016) ("A petitioner who has no viable trial defenses cannot establish prejudice from counsel's advice to plead guilty.").

### III. DISCUSSION

**Ground One**          **"Mr. DeMontalvo Was Denied His Sixth Amendment Right to Effective Assistance of Trial Counsel When Counsel Failed to Have Him Examined By an Expert in Preparation for an Insanity Defense." Doc. 1 at 9a.**

DeMontalvo states in his reply that he "abandons" this claim. Doc. 10 at 1. Accordingly, Ground One is deemed withdrawn, and federal habeas relief will be denied on this claim.

**Ground Two**        <u>**"Mr. DeMontalvo Was Denied His Sixth Amendment Right to Effective Assistance of Counsel at Plea Phase Because He Suffers Mental Illness and Was Not Taking Psychotropic Drugs." Doc. 1 at 11a.**</u>

DeMontalvo alleges that during his pretrial detention in the county jail, he was prescribed two medications—Remeron and Buspar—to "control his mental illness." Doc. 1 at 11a.[7] DeMontalvo asserts that on an unspecified date, trial counsel was "preparing him" for the plea hearing and explained that the court would ask him questions under oath. Counsel advised DeMontalvo that there would be "two major points," specifically, "whether any promises had been made about his sentence and whether he was under the influence of any drugs." *Id*.

DeMontalvo alleges that "[c]ounsel explained that if he did not respond no to both of those questions the court would not accept his plea and if he went to trial he was getting life in prison." *Id*. DeMontalvo claims that "[d]ue to this conversation, Mr. DeMontalvo stopped taking his medication. He did not understand that taking the anti-psychotic drugs that suppressed his auditory hallucinations, and paranoid episodes did not count." *Id*. DeMontalvo faults counsel for "fail[ing] to advise him

_____

[7] The court takes judicial notice, under Federal Rule of Evidence 201, that Remeron is a prescription medication used to treat depression. *See* https://medlineplus.gov/druginfo/meds/a697009.html. BuSpar is a prescription medication used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety. *See* https://medlineplus.gov/druginfo/meds/a688005.html.

that the use of psychotropic medication was acceptable during court proceedings." Doc. 10 at 1. DeMontalvo characterizes counsel's advice as "affirmative and misleading advice that was no doubt accidental." Doc. 1 at 11b.

DeMontalvo maintains that as a result of counsel's conduct, his mind "was in an altered state when he entered his plea," and that "e[x]cept for counsel's misadvise Mr. DeMontalvo would not have entered his plea." *Id*. at 11b. DeMontalvo explains:

> Mr. DeMontalvo's plea was not in his interest. His mind was not working right. He did not understand that he could get life from his plea. He knew the crime carried up to life, but understood this to be if he went to trial. His mind was clouded.

*Id*. at 11a.

## A.    DeMontalvo's Claim is Procedurally Defaulted

DeMontalvo admits that he did not present this claim to the state courts, and that it is unexhausted. Doc. 1 at 13, 17a-17b. DeMontalvo's unexhausted claim is now procedurally barred as untimely under Florida rules of procedure, because it has been more than two years since his conviction and sentence became final. *See* Fla. R. Crim. P. 3.850(b). DeMontalvo's claim is also barred under Florida's prohibition on successive Rule 3.850 motions, because it was not asserted in his prior Rule 3.850 proceeding. *See* Fla. R. Crim. P. 3.850(h). DeMontalvo relies on *Martinez, supra*, to excuse his procedural default. Doc. 1 at 17a-17b.

The State argues that DeMontalvo cannot satisfy the *Martinez* standard, because his ineffective-assistance claim is not substantial. Doc. 6 at 37-39.

## B.    DeMontalvo Fails to Satisfy *Martinez*'s Third Prong and Also Fails to Establish That He Is Entitled to Habeas Relief

For context, DeMontalvo raised a similar claim in state court. In "Ground One" of his Rule 3.850 motion, he alleged that counsel was ineffective for "failing to move to have the Defendant's competency evaluated." *See* Doc. 6-4, Ex. M at 22-33. For support, DeMontalvo attached the testimony of Dr. Julie Harper—a forensic psychologist who testified on his behalf at sentencing in support of a mitigated sentence. *Id*. & Attach.

The state court rejected the ineffective-assistance claim because it was refuted by the record. Doc. 6-4, Ex. M at 86-89 & Attach. The state court's detailed, record-supported and well-reasoned decision is enlightening. For example, the state court explained:

> At sentencing, Dr. Julie Harper testified on the Defendant's behalf. Dr. Harper testified that the Defendant probably has a "high-average to gifted range of intellectual ability." Dr. Harper testified that the Defendant suffers from depression, a "dependent personality disorder" and that the Defendant has a "mixed substance abuse history." However, Dr. Harper's testimony gave no indication that the Defendant would be incompetent to stand trial. Dr. Harper discussed how the Defendant may not have been able to store memories of the crime because of the Defendant's drug use at the time. However, Dr. Harper explained that the Defendant "has intact memory for the things that have been described to him since October.

Page 19 of 38

Doc. 6-4, Ex. M at 87 (citations to attachments omitted). After additional discussion, the state court also noted:

> The Defendant was able to appropriately answer the Court's questions during the plea colloquy. The Defendant was able to testify relevantly at sentencing. The transcripts reflect that the Defendant was able to manifest appropriate courtroom behavior. The Court noted that the Defendant appeared to be competent to the Court.

*Id*. at 88 (citations to attachments omitted).

Having failed to succeed on that claim in state court, DeMontalvo now has tweaked his ineffective-assistance claim to assert that counsel's advice concerning what to expect at the plea hearing caused him to be incompetent on the day he entered his plea because he did not take his medication. This claim falls even shorter of the mark required by *Strickland*.

For starters, counsel's advice—as described by DeMontalvo himself—was correct. As counsel predicted, the court asked DeMontalvo a number of questions during the plea colloquy, including: "Has anyone made you any promises as to what my sentence would be or any promises about anything whatsoever?" Doc. 6-1, Ex. A at 63. The court also asked DeMontalvo: "Have you had any sort of medicine, alcohol, or any other substance in the last 24 hours which would make it so that you do not understand what we're doing here?" *Id*. at 62. Had DeMontalvo answered

"yes" to either question, the court would have questioned him further and, if not satisfied that the plea was knowing and voluntary, would not have accepted it.

The fact that DeMontalvo misunderstood counsel's advice, even if true, does not arguably support a finding that counsel's advice was objectively unreasonable, or that it was outside "the range of competence demanded of attorneys in criminal cases." *McMann*, 397 U.S. at 771; *see also Stano*, 921 F.2d at 1150–51 (holding that a petitioner must show that counsel committed a "serious dereliction" of her duty when advising him regarding the plea). A reasonable attorney in counsel's position discussing a plea colloquy with a client who had a history of illegal drug use and who was prescribed medication for depression, would not assume that her client equated being "under the influence of . . . drugs" with taking prescribed medication.

Second, the transcript of DeMontalvo's plea colloquy refutes his vague allegation that "his mind was not working right" and "was clouded" when he entered his plea. At the plea hearing, DeMontalvo made the following representations under oath:

> THE COURT: . . . Counts 1 and 2, attempted first degree premeditated murder with a firearm; life, $10,000 fine – Count 1 is a 20-year minimum mandatory.
>
> . . . .
>
> . . . Count 2 is a 10-year minimum mandatory; Count 3, attempted armed burglary with a weapon, $10,000 fine, 10-year minimum

Page 21 of 38

mandatory; Count 4, burglary of a dwelling while armed with a firearm, 10/20/Life, a $10,000 fine, 10-year minimum mandatory.

Counts 5 and 6 are both burglary of an unoccupied conveyance, five years state prison, $5,000 fine, 10-year minimum mandatory on each.

Are you aware of these charges as they were originally brought against you and the maximum fines and sentences that they carry?

THE DEFENDANT:  Yes, ma'am.

THE COURT: I am holding a sentence recommendation in my hand regarding your case. It isn't a recommendation to the sentence; however, it does clear out the different charges and gives you the opportunity to plead to some and plead to lesser includeds and some are nolle prossed.

. . . .

Have you had enough time to sit down with counsel and go over the sentence recommendation so that you understand everything that it says?

THE DEFENDANT:  Yes, ma'am.

THE COURT:   And this is your signature on the last page of the document?

THE DEFENDANT:  Yes, ma'am.

THE COURT:   You understand, then, sir, that by entering into this agreement, you give up the right to make the State prove their case against you beyond a reasonable doubt in a court of law?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Since there isn't going to be a trial, you are giving up a number of rights such as the right to put on evidence, to cross-examine evidence, to testify, to exercise your right to remain silent, and you are giving up your right to appeal your guilt or innocence; do you understand this?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Are you entering this plea freely and voluntarily?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Have you had any sort of medicine, alcohol, or any other substances in the last 24 hours which would make it so that you do not understand what we're doing here?

THE DEFENDANT:  No, ma'am.

THE COURT:  **Let the record reflect that he does appear competent to the Court.**

Are you satisfied with the services of your attorney?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Do you understand if you are not a U.S. citizen, any plea like this can be used against you in a deportation proceeding?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  All right. This is a plea straight to the Court, which means that the sentence is going to be mine and mine alone. And I understand right now that there's some discrepancies with your scoresheet that y'all want to clear up. But the truth is, I guess from your age, because you have the – a shot at youthful offender, the truth is you have a shot from anything from any non-state prison sanction all the way up to life; do you understand that?

Page 23 of 38

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Has anyone made you any promises as to what my sentence would be or any promises about anything whatsoever?

THE DEFENDANT:  No.

THE COURT:  With all of this being said, sir, is it your intent today to enter a plea of guilty to these charges because you are indeed guilty or no contest because it will be within your best interest to do so?

THE DEFENDANT:  No contest.

Doc. 6-1, Ex. A at 59-64 (emphasis added).

All of DeMontalvo's answers were responsive, appropriate, and reflected a rational and factual understanding of the charges, the plea terms and its consequences. Doc. 6-1, Ex. A at 59-64. The trial court found, after observing DeMontalvo and listening to his responses, that he appeared to be competent. *Id*. at 63.

DeMontalvo's testimony at his sentencing hearing, which occurred almost three months after he entered his plea, also refutes his present allegations that: (1) his mind "was not working" and "was clouded" when he entered his plea; and (2) he did not understand that the court could sentence him to life imprisonment. When DeMontalvo addressed the court at sentencing, he gave no indication that he had not been clear-minded when he entered his plea, that his plea was involuntary, or that he wanted to withdraw it. To the contrary, DeMontalvo confirmed his decision and

asked the court for leniency based on his acceptance of responsibility, his remorse, and his desire to work to pay the restitution he owed the victims. DeMontalvo read the following letter he wrote to the sentencing judge. Note that DeMontalvo distinguished "medication" from "drugs:"

> From the time I was in the eighth grade of school until the day I came to jail, I've been addicted to drugs and I have used them just about every day. Before coming to jail, my main drugs of choice were cocaine, marijuana and LSD. As well as using drugs, I sold them to support my expensive addictions.

> On September 4th of 2014, I was under the influence of three hits of liquid microdot LSD, as well as cocaine, marijuana, and Xanax. The effects of the drugs, mainly the LSD, ruined my life that day. The only way to describe what happened is that, I became possessed or taken over by a split personality while under the power of – powerful effects of the LSD, as well as the other drugs I mixed together.

> The evidence clearly shows what happened that day, but I don't remember attacking any of my victims, being arrested, going to the hospital for stitches or even coming to jail.

> What I do know is that, around the month of October of 2014, the side effects of all the drugs wore off and I woke up to a hard-core reality. I just woke up in jail one day confused and disoriented. I quickly pieced together what all had happened and I was completely in shock. I've been an endless emotional wreck since October of 2014 until now. And for months, I was on antidepressants and anxiety medication that the jail provided for me.

> After all the drugs and their effects were out of my system, I did the best I could to apologize to my victims. I sent letters of apology to Zack Brown and his family, as well as my family and friends. I was not able to apologize to my other victims due to the fact that I did not know them at all and I had no way to apologize to them. So, right now, I want

to take the time to say, I'm sincerely sorry to all the innocent people I attacked, as well as I'm sorry to everyone else I affected. I pray every day for all my victims' physical and emotional recoveries, as well as their forgiveness.

I'm 20 years old. I have no prior criminal history. The crimes I committed on September 4, 2014 were a direct result of my excessive drug abuse and should have never happened.

I do not remember committing any of these crimes and I had no prior motives or intentions to commit them before they occurred. I pray that the court system will take these facts into consideration and show me mercy. I understand I'm still to be held responsible for my actions, but I'm also asking for another shot at a free life before I'm an old man. If I were to get a downward departure, I would do everything I possibly could to make amends with my victims and pay whatever sums of money I owe them, even if I have to live as a poor man for the rest of my life.

Once again, I pray that the Court takes everything I've said into consideration and I pray that you'll show me mercy. Thank you. May God bless everyone.

Doc. 6-1, Ex. A at 143-45.

The transcripts of the plea and sentencing hearings refute DeMontalvo's assertions that counsel misadvised him, and that he was prejudiced by counsel's advice. DeMontalvo's testimony at sentencing confirmed that he was competent to enter the plea he negotiated, and that he entered it knowingly because it was in his best interest.

DeMontalvo also has not convinced this court that a decision to reject the plea bargain would have been rational under the circumstances. There was overwhelming

evidence of DeMontalvo's guilt: (1) several eyewitnesses; (2) DeMontalvo's presence at the scene and injuries consistent with having committed the crimes; (3) DeMontalvo's admissions to his sister during the video visitation; and (4) physical evidence from the crime scenes. *See* Doc. 6-2, Ex. B at 178-225, 228-37 (Escambia County Sheriff's Office investigative reports that detail the investigation; describe sworn statements by eyewitnesses and law enforcement witnesses; reference photo identifications and physical evidence; and describe DeMontalvo's statements during the video visitation with his sister). DeMontalvo does not allege, nor does the record support a finding, that he had a viable defense.

Entering the plea allowed DeMontalvo to improve his chance for leniency at sentencing by taking responsibility for his crimes and showing remorse. Entering the plea also allowed DeMontalvo to cap his potential mandatory minimum terms of imprisonment to a maximum of 33 years instead of 70 years. The plea gave DeMontalvo the chance to avoid the worst case (and likely) scenario of "dying in prison." Doc. 1 at 11b. Additionally, as he put it, the plea gave DeMontalvo "another shot at a free life before [he was] an old man." Doc. 6-1, Ex. A at 145.

For all of the above reasons, DeMontalvo fails to demonstrate that his ineffective-assistance claim is "substantial" and has "some merit" such as to excuse his procedural default. *See Martinez*, 566 U.S. at 14. DeMontalvo also fails to show

that his ineffective-assistance claim, even reviewed *de novo*, warrants federal habeas relief.

**Ground Three**     **"Mr. DeMontalvo Was Denied His Sixth Amendment Right to Effective Assistance of Trial Counsel at Sentencing Phase in a Non-Capitol [sic] Case." Doc. 1 at 13a.**

DeMontalvo alleges that at sentencing, the trial court incorrectly stated that Florida's sentencing scheme required her to run each of DeMontalvo's mandatory minimums consecutively. DeMontalvo asserts that this statement of the law was incorrect, because in Florida it is within the court's discretion whether to impose such terms concurrently or consecutively. DeMontalvo claims that trial counsel "was constitutionally deficient for not knowing the law that applied to the case she was representing at sentencing and correcting this cru[c]ial misconception." Doc. 1 at 13a.

### A.     DeMontalvo's Claim is Procedurally Defaulted

DeMontalvo admits that he did not present this claim to the state courts, and that it is unexhausted. Doc. 1 at 15, 17a-17b. DeMontalvo's unexhausted claim is now procedurally barred as untimely under Florida rules of procedure, because it has been more than two years since his conviction and sentence became final. *See* Fla. R. Crim. P. 3.850(b). DeMontalvo's claim is also barred under Florida's prohibition on successive Rule 3.850 motions, because it was not asserted in his prior Rule 3.850

proceeding. *See* Fla. R. Crim. P. 3.850(h). DeMontalvo relies on *Martinez, supra*, to excuse his procedural default. Doc. 1 at 17a-17b.

The State argues that DeMontalvo cannot satisfy the *Martinez* standard, because his ineffective-assistance claim is not substantial. Doc. 6 at 39-42.

### B.    DeMontalvo Fails to Satisfy *Martinez*'s Third Prong and Also Fails to Establish That He Is Entitled to Habeas Relief

At sentencing, the court ordered that each of the three mandatory minimum terms of imprisonment under Fla. Stat. § 775.087, for use of a firearm, be served consecutively. The court stated: "The minimum mandatories, though, are going to run consecutive, because I do believe it's required by law and they are to run consecutive." Doc. 6-1, Ex. A at 171; *see also id*. at 167 (trial court's discussion of whether the current case law required her to order that the terms be served consecutively).

DeMontalvo was sentenced on June 24, 2015. At that time, binding precedent of the First DCA—the jurisdiction under which the trial court fell—required that mandatory minimum terms of imprisonment under § 775.087 for crimes committed during a single criminal episode be imposed consecutively. *See Walton v. State*, 106 So. 3d 522, 527-28 (Fla. 1st DCA 2013); *see also Pardo v. State*, 596 So. 2d 665, 667 (Fla. 1992) ("[I]f the district court of the district in which the trial court is located has decided the issue, the trial court is bound to follow it.").

More than 8 months *after* DeMontalvo was sentenced, the Florida Supreme Court held that "under the plain language of section 775.087(2)(d), consecutive mandatory minimum sentences are not required, but are permissible, if the sentences arise from a single criminal episode." *Williams v. State*, 186 So. 3d 989, 944 (Fla. Mar. 3, 2016).

In the Eleventh Circuit, there is a "wall of binding precedent which shuts out any contention that an attorney's failure to anticipate a change in the law constitutes ineffective assistance of counsel." *United States v. Ardley*, 273 F.3d 991, 993 (11th Cir. 2001); *see also Jackson v. Herring*, 42 F.3d 1350, 1359 (11th Cir. 1995) ("To be effective within the bounds set by *Strickland*, an attorney need not anticipate changes in the law."); *Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) ("We have held many times that reasonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop." (collecting cases)); *Davis v. Singletary*, 119 F.3d 1471, 1476 (11th Cir. 1997) ("[I]t was not professionally deficient for [counsel] to fail to anticipate that the law in Florida would be changed in the future to bar the admission of hypnotically induced testimony."); *Pitts v. Cook*, 923 F.2d 1568, 1572-74 (11th Cir. 1991); *Thompson v. Wainwright*, 787 F.2d 1447, 1459 n.8 (11th Cir. 1986) ("[D]efendants are not entitled to an attorney capable of foreseeing the future

development of constitutional law."); *Funchess v. Wainwright*, 772 F.2d 683, 691 (11th Cir. 1985) ("The failure of counsel to anticipate that an otherwise valid jury instruction would later be deemed improper by the state judiciary does not constitute ineffective assistance of counsel.").

Thus, even assuming *arguendo* that DeMontalvo's crimes could be deemed to have been committed during a single criminal episode, with binding precedent dictating that the mandatory minimum terms of imprisonment be imposed consecutively, there was no basis for trial counsel to have lodged an objection, nor can counsel be deemed ineffective for failing to anticipate that that precedent would be overruled.

DeMontalvo fails to demonstrate that his ineffective-assistance claim is "substantial" and has "some merit" such as to excuse his procedural default. *Martinez*, 566 U.S. at 14. DeMontalvo also fails to show that his ineffective-assistance claim, even reviewed *de novo*, warrants federal habeas relief.

**Ground Four**         **"Counsel ineffective not informing Petitioner his plea involved subject[ing] him to slavery." Doc. 1 at 15.**

DeMontalvo claims that trial counsel was ineffective for failing to advise him that by entering his *nolo contendere* plea, he was waiving his Thirteenth-Amendment right to be free from slavery and involuntary servitude. In support, he alleges:

> I did not know the U.S. Const. protected me from slavery unless convicted of a felony. I never dreamed of the treatment, and departures, and dehumanizing conditions slavery in the modern world entailed. Had I known I would be a slave of the State of Florida I would not have entered my plea. I am now a slave for my entire life in conditions that make me feel more like an animal in a kennel tha[n] a human with emotions and feelings.

Doc. 1 at 15. DeMontalvo's reply describes the conditions of confinement that he believes are inhumane. Doc. 10 at 5-8.

### A.   DeMontalvo's Claim is Procedurally Defaulted

DeMontalvo admits that he did not present this claim to the state courts, and that it is unexhausted. Doc. 1 at 15-16, 17a-17b. DeMontalvo's unexhausted claim is now procedurally barred as untimely under Florida rules of procedure, because it has been more than two years since his conviction and sentence became final. *See* Fla. R. Crim. P. 3.850(b). DeMontalvo's claim is also barred under Florida's prohibition on successive Rule 3.850 motions, because it was not asserted in his prior Rule 3.850 proceeding. *See* Fla. R. Crim. P. 3.850(h). DeMontalvo relies on *Martinez, supra*, to excuse his procedural default. Doc. 1 at 17a-17b.

The State argues that DeMontalvo cannot satisfy the *Martinez* standard, because his ineffective-assistance claim is not substantial. Doc. 6 at 42-43.

**B.    DeMontalvo Fails to Satisfy *Martinez*'s Third Prong and Also Fails to Establish That He Is Entitled to Habeas Relief**

DeMontalvo claims that counsel was ineffective for failing to advise him that by entering his plea he was waiving his Thirteenth-Amendment right not to be subjected to slavery or involuntary servitude. The Thirteenth Amendment provides:

> Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

U.S. Const. amend. XIII, § 1. "By its terms the [Thirteenth] Amendment excludes involuntary servitude imposed as legal punishment for a crime." *United States v. Kozminski*, 487 U.S. 931, 943 (1988).

DeMontalvo cannot credibly assert that he did not know that his plea of *nolo contendere* could result in the penalty of imprisonment in a Florida state prison with its attendant harsh and restrictive conditions, including compelled work. To the contrary, DeMontalvo's plea agreement—and the plea and sentencing transcripts—prove that DeMontalvo knew that imprisonment was a possible penalty.

DeMontalvo's assertion that counsel was obliged to advise him concerning the Thirteenth Amendment is frivolous. The first prong of the *Strickland* standard—constitutional deficiency—"is necessarily linked to the practice and expectations of the legal community." *Padilla*, 559 U.S. at 366. "The proper measure of attorney

performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The Supreme Court "long ha[s] recognized that prevailing norms of practice as reflected in American Bar Association standards and the like are guides to determining what is reasonable." *Padilla*, 559 U.S. at 366 (alterations adopted; internal quotation marks and citation omitted).

DeMontalvo has not identified any guide or standard of the legal profession that arguably supports the view that counsel in a criminal case must advise her client regarding the Thirteenth Amendment or the conditions of his confinement. The undersigned has not found any such authority. DeMontalvo has not shown that counsel's failure to advise him about the Thirteenth Amendment was objectively unreasonable or rendered his plea involuntary.

Finally, to the extent DeMontalvo believes that his plea waived his right to be free from inhumane conditions of confinement, he is mistaken. He retained that right under the Eighth Amendment. The Eighth Amendment "imposes [a] constitutional limitation upon punishments: they cannot be 'cruel and unusual.'" *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981). A prison condition is unconstitutional if it deprives the plaintiff of a human need, *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 305 (1994)), or otherwise "'pose[s] an unreasonable risk of serious damage to his future health' or safety," *Chandler v.*

Page 34 of 38

*Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). In other words, prison officials "must provide humane conditions of confinement; [they] must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). If DeMontalvo believes that the conditions of his confinement are inhumane, he may challenge them by filing a civil rights lawsuit.

For all of the reasons discussed above, DeMontalvo fails to demonstrate that his ineffective-assistance claim in Ground Four is "substantial" and has "some merit" such as to excuse his procedural default. *Martinez*, 566 U.S. at 14. DeMontalvo also fails to show that his ineffective-assistance claim, reviewed *de novo*, warrants federal habeas relief.

## IV.  CERTIFICATE OF APPEALABILITY IS NOT WARRANTED

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability. *See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 327). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added). Here, Petitioner has not made the requisite demonstration. Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should

issue." 28 U.S.C. § 2254 Rule 11(a).  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

## V.  CONCLUSION

It is **ORDERED** that: The clerk of court shall change the docket to reflect that Ricky D. Dixon has been substituted as the Respondent in this action.

In addition, for the reasons set forth above the undersigned respectfully **RECOMMENDS** that:

1.  The petition for writ of habeas corpus, Doc. 1, challenging the judgment of conviction and sentence in *State of Florida v. Hector Adolfo DeMontalvo*, Escambia County Circuit Court Case No. 2014-CF-3813, be **DENIED**.

2.  The District Court **DENY** a certificate of appealability.

3.  The clerk of court close this case file.

At Pensacola, Florida, this 13th day of May, 2022.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

### <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not</u>**

**<u>control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**